790 So.2d 1158 (2001)
ORKIN EXTERMINATING COMPANY, INC., Appellant,
v.
Christopher DeLGUIDICE, Appellee.
No. 5D00-1997.
District Court of Appeal of Florida, Fifth District.
July 13, 2001.
Rehearing Denied August 14, 2001.
Douglas B. Brown and Daniel J. Gerber of Rumberger, Kirk & Caldwell, Orlando, for Appellant.
*1159 David Oliver, John A. Boudet and Michelle M. Perez-Sotolongo of Greenberg Traurig, P.A., Orlando, for Appellee.
PLEUS, J.
Orkin Exterminating Company appeals a judgment awarding Christopher DelGuidice $300,000 in his breach of contract action against Orkin. Two years after DelGuidice completed his 10,000 square foot $1.3 million dollar home, DelGuidice purchased from Orkin a termite protection plan. The termite protection plan has, in addition to the promise to repair termite damage, the promise to retreat to prevent or control a re-infestation. The contract between Orkin and DelGuidice is essentially a guarantee, renewable by DelGuidice, that for as long as he pays the annual premium, Orkin will:
AT NO EXTRA COST, re-treat when required to prevent or control a re-infestation of subterranean termites and repair new damage to the structure and contents caused by Subterranean Termites, provided it is established that such new damage was caused by Subterranean Termites after the date of initial treatment, and that at the time of discovery of the new damage, the damaged areas are infested with live Subterranean Termites.
The breach of this guarantee and the jury award to DelGuidice of "stigma," or diminution in value, damages of $300,000 is the subject of this appeal.
Orkin maintains that the jury should not have considered a loss in market value arising from the stigma of having a home with an extensive history of termites because the parties' contract specifies that the exclusive remedy for a breach of the contract is retreatment and repair. Orkin points out that by the date of trial, in addition to providing seventeen apparently unsuccessful retreatments, it had paid DelGuidice over $78,000 for repairs to his home. Orkin concedes that it may have made mistakes in treating the DelGuidice home, but it stresses that DelGuidice's remedy under the parties' contract, as for any existing or future damage, and for any existing or future infestations, is to keep paying the renewal premium and, in return, Orkin will be obligated to continue retreatment if and when necessary to prevent or control re-infestations and to repair damages caused by new termite activity. Because stigma damages are not contemplated by the terms of the parties' contract, we reverse.
Diminution in value damages, or stigma damages, not otherwise provided for in a contract can be awarded in Florida on a breach of contract theory only in limited circumstances. Diminution in value damages are appropriate when the remedy of repair or replacement is impracticable. A prime example would involve substantial economic waste. In Grossman Holdings Ltd. v. Hourihan, 414 So.2d 1037 (Fla. 1982), the Florida Supreme Court adopted subsection 346(1)(a) of the Restatement (First) of Contracts (1932) with respect to breaches of construction contracts. The court, in addition to adopting and quoting this subsection in its opinion, quoted the comment on subsection 346(1)(a). The comment to the subsection states:
The purpose of money damages is to put the injured party in as good a position as that in which full performance would have put him; but this does not mean that he is to be put in the same specific physical position. Satisfaction for his harm is made either by giving him a sum of money sufficient to produce the physical product contracted for or by giving him the exchange value that that product would have had if it had been constructed. In very many cases it makes little difference whether the measure *1160 of recovery is based upon the value of the promised product as a whole or upon the cost of procuring and constructing it piecemeal. There are numerous cases, however, in which the value of the finished product is much less than the cost of producing it after the breach has occurred. Sometimes defects in a complete structure cannot be physically remedied without tearing down and rebuilding, at a cost that would be imprudent and unreasonable. The law does not require damages to be measured by a method requiring such economic waste. If no such waste is involved, the cost of remedying the defect is the amount awarded as compensation for failure to render the promised performance.
Id. at 1039 (emphasis added). In United States Steel Corp. v. J.C. Benefield, 352 So.2d 892, 894 (Fla. 2d DCA 1977), the second district succinctly summarized this law limiting a damages award by stating, "the general rule appears to be that the cost of restoration will not be awarded if it is more than the diminution in market value."
The purpose of providing an alternative method of computing damages on the basis of diminution in value (the difference between the value of that which was provided and the value of what should have been provided) is to prevent economic waste and to prevent, as well, potential windfalls to plaintiffs. If a plaintiff can be made whole by being compensated by a repair, the law generally does not allow an additional windfall type of recovery for any diminution in value which occurs beyond the cost of repair. On the other hand, if the diminution in value is less than the cost of repair, diminution in value becomes the standard because, to repair in such a circumstance would amount to economic waste. Applying these principles to the instant case, the diminution in value damages of $300,000 could have properly been presented to the jury if competent substantial evidence had been presented that the cost to repair existing termite damage and the cost of providing effective termite eradication procedures would have constituted economic waste. In other words, had evidence been presented that the cost of repair was substantially greater than the diminution in value, diminution in value would have been the proper standard to apply.
While DelGuidice maintains that the termites could not be eradicated without having his house torn down, DelGuidice's termite expert at trial, Dr. Roger Gold, did not in any way suggest that such a drastic procedure was necessary to solve the termite problem or for that matter, that modifications to the structure and repair of the structure would approach anything near $300,000. Asked if he believed termites would visit the house again next year as they had the past seven years, Dr. Gold simply testified, "there's a high probability that on schedule [next year] that there will be a swarm of termites in that home." On the specific question of solving the termite problem without tearing the house down, the following exchange took place between Dr. Gold and an attorney for Orkin:
Q. So then you agree that there are ways to solve the termite problems without totally destroying the house.
A. Without totally destroying the house.
Q. In fact, it's your opinion that by further studying the home, maybe opening up some of the walls minimally, you believe you can stop the termites from coming into the home. Don't you believe that?
A. I have no idea whether I can stop the termites from coming into the home by opening up a few areas in that house. *1161 I know that there are areas of the house that need to be opened up and examined very carefully and then a treatment plan can be put together that is relevant to the amount of damage and addresses those areas where the damage has occurred.
Dr. Gold then admitted that he was never asked by DelGuidice to come up with a plan even though he could have come up with a plan. He also admitted that he was never asked to determine the amount of existing damage in the house even though he also assumed "that I would have that ability, if I had the staff and the desire to do so."
Because DelGuidice did not demonstrate that it would constitute economic waste to have existing termite damage, if any[1], repaired, and to "retreat when required to prevent or control a re-infestation," the jury should not have been asked to determine the extent of the diminution in value attributable to the continued existence of the termite problem. Dr. Gold's testimony was, in fact, nearly the opposite of what was needed to allow the jury to consider the diminution in value. Dr. Gold testified the house did not need to be torn down in order to fix the termite problem, and that it was practicable to come up with a solution but that he was neither asked to assess the existing damage nor asked to devise a treatment plan designed to prevent a re-infestation. In short, neither a showing of impracticability nor of economic waste was made.
By failing to show that economic waste would result in attempting to effectively fix the termite problem, DelGuidice's remedy was limited to that specified in his contract: retreatment and the repair of damage caused by termite infestation subsequent to issuance of the guarantee. DelGuidice is bound by the remedy set forth in his contract with Orkin.
This principle of being limited by the remedy provided for in the parties' contract is set forth clearly in the recent case of Siegle v. Progressive Consumers Insurance Co., 788 So.2d 355 (Fla. 4th DCA 2001). Siegle brought suit against her vehicle insurer alleging that it had a duty, under their contract, to pay not only to have her car repaired to the condition it was in before the accident, but to also pay for the diminution in the market value of her car on account of the accident. The fourth district, although it certified the question to the Florida Supreme Court, found that a policy which provides that the insurer will repair or replace the damaged vehicle with other of like kind and quality, does not obligate the insurer to additionally provide diminution damages after it completes a "first-rate repair" which returns the vehicle to its pre-accident level of appearance, performance and function.
In Rezevskis v. Aries Insurance Co., 784 So.2d 472 (Fla. 3d DCA 2001), the third district similarly held that such a "repair or replace" clause in a motor vehicle policy does not place on the insurer the further obligation to pay for the diminution in value caused by the market psychology that a vehicle substantially damaged in an accident, even though "fixed," is not as valuable as one that has not been in an accident.
Orkin, like the motor vehicle insurers, specifically limited DelGuidice's remedy to one of repair. Like the insurers, who insure against loss of property for injuries to that property caused either by the negligence of a third party, the negligence *1162 of the insured, or possibly some acts in which no negligence caused injury, Orkin, under its contract, promises to repair property damaged by an infestation of termites subsequent to the date of Orkin's original treatment of the property. Both the vehicle insurers in Siegle and Rezevskis and Orkin, pursuant to a contract, guarantee or promise to do a certain thing if certain conditions occur. The parties by their contract agreed ahead of time to the remedy of repair and retreatment.[2] "A party to a contract, who agrees to accept a sum as liquidated damages, cannot sue for actual damages." Waters v. Key Colony East, Inc., 345 So.2d 367 (Fla. 3d DCA 1977). The "sum" agreed to as liquidated damages in this case was the repair of any damages caused by termites and any retreatment necessary to prevent reinfestations.
By the holding in this case we do not mean to suggest that DelGuidice must allow Orkin to continue indefinitely its ineffective treatment of his home.[3] DelGuidice could terminate Orkin's contract, find another contractor capable of effectively treating the home, and then seek damages for the difference in cost due to Orkin's failure or inability to "prevent or control" subterranean termites and for any physical damage to the structures. Such damages would be permitted under the language of the contract as they would flow naturally from the breach and appear to be foreseeable by the parties at the time the contract was entered into. See Scott v. Rolling Hills Place, Inc., 688 So.2d 937, 940 (Fla. 5th DCA 1996); see also Siegle v. Progressive Consumers Insurance Co., 788 So.2d 355 (Fla. 4th DCA 2001).
Although the trial court granted a directed verdict in favor of DelGuidice on a separate count brought under the Unfair Trade Practices Act, the remedy afforded under this act does not include stigma or diminution in value type damages. In Urling v. Helms Exterminators, Inc., 468 So.2d 451 (Fla. 1st DCA 1985), the Urlings sought to recover the cost of repairing termite damage to a home they purchased subsequent to obtaining and relying on a false termite inspection report issued by Helms. The court noted that the Act allows for recovery of the difference between the value of the defective services or goods provided and the value of non-defective services or goods but does not provide for recovery of consequential or special damages such as the cost of the termite repairs themselves. Other than the award of attorney's fees and costs to the prevailing party, the civil litigant bringing a successful action under the Act is entitled only to "actual damages." § 501.211 (Fla. Stat). (1999). Actual damages, as interpreted by the first district in Urling and followed by at least two other courts interpreting Florida law, does not include "actual consequential" damages. Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati, 715 So.2d 311, 314 (Fla. 4th DCA 1998); National Alcoholism Programs/Cooper City, Florida, Inc. v. Palm Springs Hospital Employee Benefit Plan, 825 F.Supp. 299, 303-304 (S.D.Fla.1993); cf. Douglas v. G.E.E.N. Corp., 415 So.2d 130 (Fla. 5th DCA 1982) (remedy in count III seeking a $1,000 civil penalty based on violation of Truth in Lending Act was not duplicitous with remedy sought in count II asking for *1163 "actual consequential damages" for violation of Unfair Trade Practices Act).
In light of the above, the case is remanded for proceedings consistent with this opinion.
REVERSED and REMANDED.
HARRIS and ORFINGER, R.B., JJ., concur.
NOTES
[1] Neither Dr. Gold nor DelGuidice's real estate valuation expert knew the extent of unrepaired termite damage existing in the home at the time of trial.
[2] Technically, in the motor vehicle cases, the insurers also had the option of paying actual cash value in lieu of repairing or replacing; in the instant contract, the remedy offered is exclusively repair and retreatment.
[3] Like swallows returning to Capestrano, termites regularly returned to DelGuidice's home. Orkin seems unable to prevent or control the infestation.